IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED

JUL 1 5 2003

U.S. DIS  TICT COURT
ELKINS WV 26241

JAMAL A. AZEEZ,

       Petitioner,

v.                                Civil Action No.  00-CV-54 (Maxwell)

WILLIAM S. HAINES,

       Respondent.

## PETITIONER'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

COMES NOW the Petitioner, Jamal A. Azeez, by and through his counsel, and hereby submits the following Memorandum of Law in Support of Motion for Partial Summary Judgment.

### STATEMENT OF FACTS

Petitioner was convicted of second degree sexual assault on July 31, 1987 in the Circuit Court of Raleigh County, West Virginia.  Subsequent to his conviction, Petitioner retained Francis Curnutte, Esquire, to represent him in an appeal to the West Virginia Supreme Court of Appeals. After filing a motion for bond pending appeal, the Circuit Court of Raleigh County granted the same and Petitioner was released on a Twenty Five Thousand Dollars ($25,000.00) appeal bond on November 5, 1987.  The bond signed by Petitioner stated that Petitioner was to report back to the Court on December 28, 1987 or when the matter was finally terminated  (See Affidavit of Jamal A. Azeez, attached hereto as Exhibit A, at Attachment 1).  However, Petitioner did not actually have to report back to the Court on December 28, 1987, as his appeal had not even been filed at that point. (See Exhibit A; See also, Excerpt from Trial Transcript, attached hereto as Exhibit B, at pp. 198 - 200).  Petitioner remained in West Virginia gainfully employed at Charleston Area Memorial Hospital after posting bond until hospital administration learned of the sexual assault conviction and

he was indefinitely suspended.  Then three (3) white men approached Petitioner in broad daylight, grabbed him by the hair, placed an object to his head, and stated, "Nigger, the best thing to do is to leave town now." After needlessly reporting this incident to police, Petitioner immediately informed Mr. Curnutte of the life-threatening incident then left the State of West Virginia, worked continuously, and filed proper income tax returns with no evidence of concealing his identity or whereabouts. (See Exhibit A).

On May 24, 1988, appellate counsel filed a Petition for Appeal with the West Virginia Supreme Court of Appeals regarding his conviction for second degree sexual assault. (See Exhibit A, at Attachment 2).  At that time, Petitioner had eight (8) months to file an appeal.  Notably, appellate counsel neglected to file the petition until nine (9) months after Petitioner's conviction. That fact is evidenced by the conviction Order that was entered on August 24, 1987. (See Exhibit A, at Attachment 3).  On July 20, 1988, the West Virginia Supreme Court of Appeals denied the Petition for Appeal. (See Exhibit A, at Attachment 4).  One week later, a capias was issued for the arrest of Petitioner. (See Exhibit A, at Attachment 5).  Remarkably, that capias was issued before Petitioner had exhausted his rights under the West Virginia Rules of Appellate Procedure as appellate counsel had sent a request for renewal of petition to the West Virginia Supreme Court of Appeals on July 22, 1988, which was received by the Court on July 26, 1988. (See Exhibit A, at Attachment 6).  Petitioner was then indicted under Criminal Action No. 88-F-203, for failing to appear. (See Exhibit A, at Attachment 8).

On August 19, 1991, Petitioner was arrested in Florida and was served with the indictment (88-F-203) for failing to appear, as the arresting document.  Petitioner immediately challenged the (bogus) indictment because on its face, it stated, "...Jamal Azeez...failed to appear on September 25,

2

1987...as ordered by Judge Canterbury...for sentencing..." Petitioner contended that his correct and full name is Jamal Adeen Azeez, that there was no order entered by Judge Canterbury commanding Petitioner's appearance in Court, that Petitioner was already sentenced on September 14, 1987 and most importantly, Petitioner was in the same courthouse jail (custody) on September 25, 1987, placed there by grand jury witness, Cedric Robertson.  (See Exhibit A).  That resistance, in the form of a habeas action, was defeated and on December 4, 1991 Petitioner was extradited back to West Virginia one hundred and eight (108) days after challenging the sufficiency of the indictment. Petitioner remained incarcerated in the Raleigh County Jail until March 22, 1993 when he was tried on the charge of failing to appear.  However, prior to that trial, Petitioner was suddenly served with a second indictment (No. 92-F-342) again charging him with failure to appear.  (See Exhibit A, at Attachment 9).  Apparently, the prosecuting attorney realized that the first indictment was fatally defective because it alleged that Petitioner failed to appear on September 25, 1987, when in fact, Petitioner was incarcerated in the Raleigh County Jail awaiting release on his appeal bond on that date and therefore, was unable to appear.  (See Exhibit A).

Despite the prosecuting attorney's pre-trial assertions to the contrary, the original indictment was not dismissed until after Petitioner was tried and convicted on the second indictment, which was also defective while the original indictment was still active.  (See Exhibit A, at Attachment 10). [1] When Petitioner was tried on the second indictment, his rights were violated in numerous ways, but for purposes of the instant motion, five (5) particular issues have been singled out to which the

---

[1] Because Petitioner was denied disclosure of requested documents and files relating to the questionable origin of the superceded indictment (92-F-342), summary judgment on this issue cannot be fully developed in this pleading.

3

evidence has been sufficiently developed such that partial summary judgment is appropriate.[2]

ISSUES

I.     **Whether the Petitioner is entitled to partial summary judgment when there are no genuine issues of material fact concerning Issues II, III, IV, V and VI.**

II.     **Whether the indictment charging the Petitioner with failing to appear violated the Petitioner's rights under the Fifth Amendment when it was defective on its face.**

III.     **Whether Petitioner's Sixth and Fourteenth Amendment rights were violated when the Circuit Court of Raleigh County misapplied the law in refusing to strike two (2) Jurors for cause thereby forcing Petitioner to use two of his peremptory challenges.**

IV.     **Whether Petitioner's Fifth, Sixth and Fourteenth Amendment rights were violated when the Circuit Court of Raleigh County refused to declare a mistrial or give a curative instruction to the Jury when Petitioner's previous attorney violated the attorney-client privilege.**

V.     **Whether Petitioner's Fourteenth Amendment rights were violated when his criminal file was lost for two years thereby depriving Petitioner and his counsel of access to critical materials for his appeal and Petition for Writ of Habeas Corpus.**

VI.     **Whether Petitioner's Fifth and Fourteenth Amendment rights were violated when he was denied one hundred eight (108) days of credit for time served before his conviction.**

DISCUSSION

I.     **Petitioner is entitled to partial summary judgment as there are no genuine issues of material fact with respect to Issues II, III, IV, V and VI.**

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

---

[2] Petitioner is not waiving any of the grounds he has asserted in his Petition Under 28 USC § 2254 For Writ Of Habeas Corpus By A Person In State Custody as a result of filing the instant motion.

4

any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of proving that there is no genuine issue of material fact rests squarely with the moving party and any doubt as to the existence of such an issue should be resolved in favor of the non-moving party. International Union, Dist. 50, UMW v. Matthiessen & Hegeler Zinc, Co., 291 F. Supp. 578 (N.D.W. Va. 1968). If the moving party meets the initial burden, then the burden shifts to the non-moving party to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. United States v. Lambert, 915 F. Supp. 797 (S.D. W.Va. 1996). After viewing the evidence, summary judgment can only be granted where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law. Furthermore, the party opposing summary judgment is entitled to all favorable inferences which can be drawn from the evidence. United States v. One 1976 Lincoln Continental Mark IV, 578 F. Supp. 402 (S.D. W.Va. 1984); Kinney v. Daniels, 574 F. Supp. 542 (S.D. W.Va. 1983).

In this action, partial summary judgment is proper as the Court may rule as a matter of law that the trial indictment charging Petitioner with failing to appear was defective on its face. Furthermore, summary judgment is appropriate as the undisputed facts prove that the Circuit Court of Raleigh County misapplied the law in refusing to strike two (2) Jurors for cause thereby forcing Petitioner to use two (2) peremptory challenges. Likewise, Petitioner's rights were clearly violated by the Circuit Court of Raleigh County's failure to declare a mistrial or give a curative instruction when Petitioner's attorney breached the attorney-client privilege and offered testimony that was barred by the Circuit Court. Error of Constitutional dimension was also committed when Petitioner was deprived of his Court file for two years thereby prejudicing his ability to seek post-conviction

relief.  Finally, Petitioner's rights were unequivocally violated when he was denied credit for time

he has served.

**II.**    **The indictment charging Petitioner with failing to appear was defective
on its face in violation of Petitioner's rights.**

Petitioner was originally indicted in the Circuit Court of Raleigh under Criminal Action No.

88-F-203 on September 12, 1988.  Petitioner was served with that indictment after his arrest in

Florida on August 19, 1991, and he was extradited back to West Virginia on December 4, 1991

under that indictment.  (See Exhibit A).  According to the indictment, Petitioner failed to appear for

sentencing as ordered by Judge Canterbury.  (See Exhibit A, at Attachment 8).  That indictment was

clearly defective on its face because Petitioner had not been released on bond pending his appeal as

of September 25, 1987.  Rather, Petitioner was not released on bond until November 5, 1987.  (See

Exhibit A, at Attachment 1).  Furthermore, Petitioner was sentenced on September 14, 1987 and

therefore, could not be commanded to appear for sentencing a second time on September 25, 1987.

(See Order, attached hereto as Exhibit C).[3]  Consequently, Petitioner could not be convicted for

failing to appear under Criminal Action No. 88-F-203 because the indictment was fatally defective

on its face.[4]  Recognizing that problem after defense counsel filed a motion to dismiss, Petitioner was

allegedly re-indicted on November 2, 1992, under Criminal Action No. 92-F-342 during an alleged

---

[3] Those errors raise serious doubts as to the truthfulness of Detective Cedric Robertson's
grand jury testimony.

[4] Petitioner contends that the Grand Jury did not meet on November 2, 1992 or it did so
in violation of the procedures for reconvening Grand Juries.  That belief is based upon the fact
that Petitioner requested dates that the Grand Jury met in 1992 and the Circuit Clerk provided a
certified response, which did not include November 2, 1992.  However, Petitioner has been
denied access to any documents relating to the meeting of the Grand Jury.  (See Exhibit A, at
Attachments 12 and 13.

"special session" that was never mentioned at trial.  (<u>See</u> Exhibit A, at Attachment 9).  That

indictment states:

> That Grand Jurors of the State of West Virginia, in and for the body
> of the County of Raleigh, upon their oaths present that JAMAL
> AZEEZ
>
> on or about July, 1988 through August, 1991, in the said county of
> Raleigh,
>
> unlawfully and feloniously, having been admitted to bail and released
> in accordance with the laws of this State, did willfully and without
> just cause fail to appear as and when it was required of him and the
> said JAMAL AZEEZ had been convicted of the felony of sexual
> assault and sentenced upon such felony...

(<u>See</u> Exhibit A, at Attachment 9).  The problem though, is that indictment is defective on its face as

well.

**A.      The United States Constitution:**

The Fifth Amendment to the United States Constitution guarantees that "[n]o person shall

be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment

of a Grand Jury..." U.S. Const. amend. V.  The Fifth Amendment further provides that no person

shall be "... deprived of life, liberty, or property, without due process of law..." <u>Id.</u>  Under the Fifth

Amendment, the government is required to secure a grand jury indictment before it may prosecute

any felony.  <u>Stirone v. United States</u>, 361 U.S. 212, 215, 80 S. Ct. 270 (1960).  If there is no

indictment or if the indictment is defective such that it is void, then a conviction results in a violation

of the accused's Fifth Amendment rights.

The Sixth Amendment to the United States Constitution guarantees that criminal defendants

shall be "... informed of the nature and cause of the accusation..."  In order for an indictment to be

sufficient under the Sixth Amendment, it "...shall advise the accused of the nature and cause of the accusation against him in order that he may meet the accusation and prepare for his trial and that, after judgment, he may be able to plead the record and judgment in bar of further prosecution for the same offense." Bartell v. United States, 227 U.S. 427, 33 S. Ct. 383 (1913). Accordingly, if an indictment is defective, then an accused's rights are violated under the Sixth Amendment. If that person has already been convicted under a defective indictment, then he or she should be released because a conviction cannot be valid if an indictment is not valid.[5]

**B.     West Virginia and the Fourth Circuit:**

Under West Virginia law, a person can be charged with failing to appear when: (1) he or she has been released upon his or her personal recognizance pursuant to West Virginia Code § 62-1C-1a, or otherwise admitted to bail and released and, (2) he or she willfully and without just cause; (3) fails to appear as and when it may be required. West Virginia Code § 62-1C-17b. In reading that statute, it is clear that the date set for the appearance is a critical element of the offense because of the language "appear as and when it may be required." The problem in the case sub judice is that Petitioner's indictment is defective on its face because in satisfying the third element of the offense, it specifically states that Petitioner failed to appear "... on or about July, 1988 through August,

---

[5] Petitioner further contends that his indictment is defective because "handwritten notes" allegedly written by the grand jury secretary falsely stated that Petitioner applied for a "Social Security number...and worked in hospital in Florida." However, there is only "garbled" information where Petitioner's minutes were recorded on the grand jury tape and therefore, there is no recorded evidence of the grand jury testimony concerning Petitioner. Petitioner further disputes that the Grand Jury even met because in a certified response to Petitioner's pro se Freedom of Information Act requests, Clerk Janice Davis verified that no Grand Jury was held on November 2, 1992 when the now-alleged 'special session' convened and returned Indictment 92-F-342. (See Exhibit A).

1991..." (See Exhibit A, at Attachment 9). That language is clearly defective because it does not state an exact date upon which Petitioner was required to appear and because it includes dates upon which Petitioner was not legally required to appear.

At common law it was necessary to allege, in the indictment, the time the offense was committed, but there was no need to prove it as laid unless some specific reason rendered time important. State v. Bruce, 26 W.Va. 153, 157 (1885). However, that requirement has been modified by statute. More specifically, the common law of this state has been slightly modified by West Virginia Code § 62-2-10.

West Virginia Code § 62-2-10 provides, in pertinent part:

No indictment or other accusation shall be quashed or deemed invalid... for omitting to state, or stating imperfectly, the time at which the offense was committed, *when time is not of the essence of the offense...*

Id. (emphasis added). The corollary of that statute is that when time is of the essences of the offense, an indictment shall be quashed or deemed invalid when the indictment does not state perfectly the time at which the offense was committed, which in this case, is the specific date set for the appearance. State v. Bermawitz, 98 W.Va. 637, 127 S.E. 494 (1925)(holding that an indictment is fatally defective when it fails to allege a specific date of a crime where the date is of the essence of the offense). That proposition is further supported by State v. Criss, 125 W.Va. 225, 23 S.E.2d 613 (1942), wherein the West Virginia Supreme Court of Appeals analyzed the terms "on or about" when used in indictments. Although Criss involved an indictment involving a larceny, the Court provided guidance for Petitioner's current case when it stated:

> We find, however, cases dealing with the *indefinite expression 'on or about', when used in an indictment in relation to time. Generally, this expression is held to be fatal to the indictment, where the statute of limitation may be involved, or the date is otherwise material.*

Id., at 230, (emphasis added); citing, United States v. Winslow, 28 Fed. Cas. 737 (1875); Morgan v. State of Florida, 51 Fla. 76, 40 So. 828, (1906); State v. Baker, 34 Me. 52 (1852); Territory v. Armijo, 7 N.M. 571, 37 P. 1117 (1894); State v. Thompson, 10 Mont. 549, 27 P. 349 (1891).

To this day, Criss has never been overruled.

Without question, the specific date a person fails to appear is material to an indictment under West Virginia Code § 62-1C-17b because if there is no date upon which a person is required to appear, then there can be no crime. In other words, if a criminal defendant has been ordered to appear in court on July 15, 2003 and he does not appear on that date, then it is improper to indict him for failing to appear "on or about" July of 2003 because there are thirty (30) other days in that month upon which the criminal defendant was not required to appear. Proving that time is of the essence in cases such as the one at bar, the Fourth Circuit Court of Appeals has stated:

> In testing the sufficiency of an indictment, the alleged date of the offense is not ordinarily considered a material allegation. 4 Barron, Federal Practice and Procedure § 1913 (Rules ed. 1951).
>
> *Except when time is of the essence of the offense, the prosecution is not confined in its evidence to the precise date laid in the indictment,* but may prove that the offense was committed on some other day prior to the commencement of the prosecution and within the period of limitations, and such proof does not constitute a material variance. 42 C.J.S. Indictments and Informations § 257 (1944).

United States v. Covington, 411 F.2d 1087, 1088-89 (4th Cir. 1969)(emphasis added). The Covington Court then affirmed "[t]hat general rule is also the rule in this circuit." Id., citing, Tincher v. Boles, 364 F.2d 497, 498 (4th Cir. 1966); Land v. United States, 177 F.2d 346, 348 (4th Cir. 1949); See, e.g.,

United States v. Edwards, 366 F.2d 853, 871-872 (1966).

In testing the sufficiency of an indictment, the Fourth Circuit Court of Appeals noted that time is essential:

> *as where it constitutes an element of the crime*; or where accused having been tried for another and similar offense within the period of limitations, proof of the exact date is necessary to show that he is not being again tried for the same offense; or, where two offenses have been committed, to enable accused to plead the judgment in the present prosecution in the event of a second prosecution; or where the date is necessary to enable the court to impose the proper sentence... 42 C.J.S. Indictments and Informations § 257, at 1279 (1944).

Id., at 1089 (emphasis added).  Therefore, the Fourth Circuit Court of Appeals in Covington, the West Virginia Supreme Court of Appeals in Criss, and the West Virginia Legislature under West Virginia Code § 62-2-10 require specificity as to a date in an indictment under West Virginia Code § 62-1C-17b or it is fatally defective on its face.  West Virginia and the Fourth Circuit are not the only jurisdictions to recognize the fatality of non-specific dates in indictments where time is an essential element of an offense.

**C.      Oregon:**

In United States v. Winslow, 28 F. Cas. 737 (1875), the District Court held that a demurrer must be sustained to an indictment alleging that a crime took place "on or about" a certain day.  According to the Winslow Court, "[e]very indictment must allege a day and a year certain on which the offense was committed."  Therefore, the District Court found that an indictment alleging that "on or about February 1, 1875" was fatally defective.  Id., at 739.  That case involved the sale of liquor to a Native American and it states the common law rule followed in West Virginia.  The only difference is that in West Virginia, the specificity of time does not matter unless time is an element

of the offense.

**D.      Florida:**

In <u>Morgan v. State of Florida</u>, 51 Fla. 76, 40 So. 828 (1906), a defendant was alleged to have committed assault with intent to rape "on or about the 27[th] day of June, A.D. 1905." After the lower court overruled the defendant's motion in arrest of judgment, he appealed on the basis that the indictment was defective inasmuch as it did not allege a certain date for the commission of the crime. Citing the common law, Clark's Criminal Procedure § 237 and Bishop's New Criminal Procedure § 587 for the proposition that an indictment must state the day, month and year, the Supreme Court of Florida concluded that:

> An allegation that the offense was committed 'on or about' a day
> named is, by the common law, insufficient. Bishop's New Cr. Proc.
> Sec. 390; Hughes Crim. Law & Proc. Sec. 2725; <u>United States v.</u>
> <u>Winslow</u>, 3 Sawyer 337, Fed. Cas. No. 16742; <u>United States v.</u>
> <u>Crittendon</u>, Hemst. 61 Fed. Cas. No. 14890a. And an indictment
> which avers that the offense was committed 'on or about' a day
> named is bad on motion in arrest of judgment. <u>State v. O'Keefe</u>, 41
> Vt. 691; <u>Territory v. Armijo</u>, 7 New Mex. 571, 37 Pac. Rep. 1117;
> <u>Mauzau-man-ne-kah v. United States</u>, 1 Pinn. (Wis.) 124.

<u>Id.</u>, at 77-78. The <u>Morgan</u> Court then reiterated that "... in the case of <u>Morgan v. State</u>, reported in 13 Fla. 671, and it was there said: 'Charging that the offense was committed 'on or about' a certain day has been universally held to be indefinite, and fatal upon demurrer or motion to quash... If no time or place be stated, or if the time or place stated be uncertain or repugnant, the defendant may demur or move in arrest of judgment, for the defect is not cured by the verdict." <u>Id.</u>, at 81. Consequently, as the indictment charging the defendant was fatally defective, the Supreme Court of Florida reversed the lower court's denial of the defendant's motion in arrest of judgment. <u>Id.</u>, at 82.

Almost seventy years later, the Supreme Court of Florida took up the same issue and

overruled the strictness of the common law rule applied in <u>Morgan v. State of Florida</u>. <u>Sparks v. State of Florida</u>, 273 So.2d 74 (Fla. 1972). In doing so, the <u>Sparks</u> Court recognized that the Florida Rules of Criminal Procedure had changed the specificity requirements of indictments in that they need only state the time of the offense "as definitely as possible." <u>Id.</u>, at 75. Nevertheless, the Supreme Court of Florida acknowledged that "... the common law rule against the use of 'on or about' in stating the date of the offense in an indictment or information still applies in some states in those cases where time is material to the crime charged" or "where time goes to the essence of the crime" <u>Id.</u>, at 76, <u>citing</u>, <u>State v. Lee</u>, 202 Or. 592, 276 P.2d 946 (1954); <u>State v. McDonald</u>, 16 S.D. 78, 91 N.W. 447 (1902); <u>People v. LaMarca</u>, 3 N.Y.2d 452, 165 N.Y.S.2d 753, 144 N.E.2d 420 (Ct. App. 1957); <u>Bell v. State</u>, 217 Ind. 323, 27 N.E.2d 362 (1940); <u>State v. District Court</u>, 125 Mont. 481, 240 P.2d 854 (1952); <u>State v. Pickles</u>, 46 N.J. 542, 218 A.2d 609 (1966); <u>Brunner v. State</u>, 154 Md. 655, 141 A. 346 (Ct. App. 1928); <u>Rema v. State</u>, 52 Neb. 375, 72 N.W. 474 (1897). Guided by those jurisdictions, the <u>Sparks</u> Court ultimately held that:

> ... an indictment or information alleging the commission of an offense 'on or about' a stated date is not fatally vague in the absence of a showing that time is material to the crime charged or that the accused is prejudiced by the use of the phrase.

<u>Id.</u>, at 76. That holding is in accord with the law as announced by the Fourth Circuit Court of Appeals in <u>Covington</u>, the West Virginia Supreme Court of Appeals in <u>Criss</u>, and the West Virginia Legislature under West Virginia Code § 62-2-10.

**E.    Maryland:**

Maryland has a statute that is similar to, but more liberal than, West Virginia Code §62-2-10. According to Maryland Code Ann., Crim. Law §553:

> No indictment or presentment for felony or misdemeanor shall be quashed, nor shall any judgment upon any indictment for any felony or misdemeanor, or upon any presentment, whether after verdict, by confession or otherwise, be stayed or revered... for omitting to state the time at which the offense was committed in any case where time is not of the essence of the offense, nor for stating the time imperfectly, of for stating the offense to have been committed on a day subsequent to the finding of the indictment, or making the presentment, or on an impossible day or on a day that never happened, or by reason of any mere defect or imperfection in matters of form which shall not tend to the prejudice of the defendant.

The similarity in West Virginia law and Maryland law rests in the fact that the failure to allege a date or the failure to state a date perfectly is not fatal to an indictment unless time is a material element of the offense.  The difference in the statutes is that Maryland allows a much more liberal use of dates than does West Virginia as long as time is not of the essence.  Nevertheless, the Court of Appeals of Maryland has considered the use of the terms "on or about" in indictments.

In Brunner v. Maryland, 154 Md. 655, 141 A. 346 (1928), the Court of Appeals of Maryland tested the sufficiency of an indictment alleging that the defendant "... on or about the first day of June, in the year of our Lord nineteen hundred and twenty-seven... unlawfully did sell alcoholic, spiritous, vinous, fermented, distilled, malt liquors and intoxicating bitters, liquid mixtures and preparation, which will produce intoxication..."  Id., at 347.  In beginning its analysis, the Brunner Court noted that at common law it was generally held to be necessary to allege the offense on a day certain.  Id.  However, like West Virginia, the Brunner Court noted that the common law had been changed by statute and that an indictment was no longer defective "... for omitting to state the time at which the offense was committed in any case where time is not of the essence of the offense..."  Id., at 347, citing, Md. Code Ann., Crim. Law §553.  While there were no other cases interpreting the use of the terms "on or about" in relation to the statute governing the sufficiency of indictments,

14

the Court found that:

> ... under the statutes now generally prevalent, rendering a statement
> of the precise time of the offense immaterial, ***save where the time is
> an ingredient of the offense***, together with statutes providing that the
> indictment shall not be held invalid for formal defects, it is usually
> sufficient to state that the offense was committed on or about a
> particular day.

Id., at 348.  The Court then went on to cite 7 Ann. Cas. 775, in a note to the case of Morgan v.

State, 51 Fla. 76, 40 So. 828 (1906), wherein the author stated:

> In many states it is provided by statute that the precise date of an
> offense is not essential to the sufficiency of an indictment unless time
> is a material ingredient of the offense.  Under such a provision it is
> held that the use of the words 'on or about' is sufficient in alleging
> the date of the offense where time is not a material ingredient of the
> offense.

Brunner, at 659.  Ultimately, the Court of Appeals of Maryland held that the indictment was

sufficient in Brunner, but that was because of the broadness of its statute governing indictments as

well as the fact that the date of the offense was not an essential element of the illegal sale of liquor.

However, Brunner provides guidance in the case sub judice because it shows that the use of the

words "on or about" in Petitioner's indictment was improper because the date of the offense certainly

is a material element of a failure to appear charge.

**F.     Maine:**

In 1852, the Supreme Judicial Court of Maine was presented with a challenge to an

indictment that alleged an illegal sale of liquor "on or about the thirty-first day of January, 1852."

State v. Baker, 34 Me. 52 (1852).  In arresting the defendant's judgment, the Baker Court agreed that

the time must be alleged in a complaint and that once the words "on or about" are inserted in a

complaint they cannot be stricken as surplusage because the complaint would then allege a specific

15

date. However, those words were not intended as surplusage when they were inserted as they were used to show that there was an uncertainty relating to time. Id., at 53. Accordingly, the judgment in the case was arrested. Id. Notably, the West Virginia Supreme Court of Appeals relied upon Baker when rendering its holding in State v. Criss, 125 W.Va. 225, 23 S.E.2d 613 (1942).

**G.    New Mexico:**

In Territory of New Mexico v. Armijo, 7 N.M. 571, 37 P. 1117 (1894), the Supreme Court of New Mexico held that an indictment was insufficient on its face because there was no certain day alleged when the offense was committed. Id., at 576. Rather, the indictment charged the defendant with assaulting a person with a deadly weapon "on or about the third day of May, A.D. 1893..." Id., at 577. Citing Bishop's Criminal Procedure for the proposition that the omission of a pleader to allege a day certain as to the time the offense was committed is fatal at common law, and finding that there is no statute to abrogate that rule, the allegation "on or about" is fatal. Id. The reasoning behind that rule is that when the terms "on or about" are used in an indictment alleging an assault with a deadly weapon:

> It does not put the defendant on sufficient notice as to the time when he is charged with the commission of the crime. The exact time in such cases is an essential element, and a material allegation, and it must be specifically charged in the indictment, in order that the defendant may properly prepare his defense. In this allegation an alibi could not with a sufficient degree of accuracy be pleaded. It might occur that a defendant had engaged in an altercation with the same person at the same place on two or even more successive days, but under very different circumstances, and to which his defense would be different, and an allegation in the indictment 'on or about' a day named would not sufficiently advise him which offense he was required to answer.

Id., at 577.

In <u>State v. Criss</u>, the West Virginia Supreme Court of Appeals cited the <u>Armijo</u> decision and its rationale is just as applicable in the case sub judice. Petitioner was charged with a crime (failure to appear) wherein the date of the offense is a critical element as defined by <u>United States v. Covington</u>, 411 F.2d 1087,1088-89 (4th Cir. 1969). However, the indictment alleged that Petitioner failed to appear "on or about July, 1988 through August, 1991..." (<u>See</u> Exhibit A, at Attachment 9). Clearly, the indictment lacked the specificity required of it under <u>Criss</u> and West Virginia Code §62-2-10, and for that reason, it should be held defective on its face. Furthermore, applying the rationale of <u>Armijo</u>, Petitioner could not plead his defenses with any degree of sufficiency because it might have occurred that Petitioner failed to appear in the Circuit Court of Raleigh County on an entirely separate matter sometime in July of 1988 and before his appeal to the West Virginia Supreme Court of Appeals was ever denied. Therefore, the indictment charging Petitioner with failing to appear was defective on its face.

**H.    Jurisdictional Consensus:**

The consensus among the various jurisdictions is that generally, a lack of specificity in alleging a date in an indictment is not fatal. The reason is because of indictment statutes that have modified the common law. Nevertheless, when a date comprises an element of a charged offense, the courts have invariably concluded that the indictment must allege that date with specificity or the indictment is fatally defective. In the case judice, no one can question the fact that an element of the offense of failure to appear is the date upon which a defendant is supposed to appear. W.Va. Code §62-1C-17b. In fact, the Circuit Court of Raleigh County even gave the following instruction to the Jury, which was based upon that statute:

Case 2:00-cv-00054-REM   Document 40   Filed 07/15/03   Page 18 of 47   PageID #: 91

... The law provides that any person, who, having been admitted to bail and released after being arrested for, charged, or convicted of a felony, shall thereafter wilfully and without just cause fail to appear as and when it may be required of him, shall be guilty of the offense of failure to appear.

... Before the defendant, Jamal Azeez, may be convicted of the offense of Failure to Appear, the State of West Virginia by competent evidence must overcome the presumption that he is innocent of that offense and prove to the satisfaction of each member of the jury beyond a reasonable doubt that:

1.     The defendant, Jamal Azeez

2.     Having been convicted of the commission of a felony in this State;

3.     Was thereafter admitted to bail and released under an order of a judge of this court;

4.     Which order required his further appearance before the court as directed by that order

5.     And that thereafter the defendant, Jamal Azeez, intentionally, willfully and without just cause failed to appear as and when his appearance was required of him.

(See Jury Instruction, attached hereto as Exhibit D).  That instruction, in paragraphs 4 and 5, demonstrate that the date of appearance is a fundamental element of the crime of failure to appear. See also, United States v. Covington, 411 F.2d 1087,1088-89 (4th Cir. 1969) Therefore, in accordance with State v. Criss, 125 W.Va. 225, 23 S.E.2d 613 (1942), United States v. Covington, 411 F.2d 1087,1088-89 (4th Cir. 1969) and West Virginia Code §62-2-10, the indictment stating Jamal Azeez failed to appear "...on or about July, 1988 through August, 1991" is fatally defective as a matter of law.[6]

---

[6] The State of West Virginia had at its disposal, the general form of indictment found in West Virginia Code §62-9-1, which states:

If Petitioner's indictment is allowed to stand, it would be violative of every decision construing the required elements in an indictment when time is of the essence. The way the indictment now stands, Petitioner failed to appear from July 1, 1988 through July 20, 1988, but it was impossible for Petitioner to have been guilty of failing to appear on those dates because his appeal was not denied until July 20, 1988. Furthermore, the dates following the denial of Petitioner's appeal are fatally defective because according to the State of West Virginia, he was supposed to appear the day his appeal was denied. Certainly, the State of West Virginia had the West Virginia Supreme Court of Appeal's decision denying Petitioner's Petition for Appeal and it could have certainly used that date in the indictment, which it should have done. Nevertheless, the State of West Virginia drafted an overly-broad indictment that did not give anyone a clue as to when Petitioner was actually supposed to report leaving him insufficient time to prepare a completely new defense. In other words, there is a question as to whether Petitioner was supposed to report to jail on July 1,

---

All indictments in this State, if procured, found and returned in all other respects as provided by law, shall be sufficient if in the following form:

State of West Virginia, County of _____, to wit:

The grand jurors of the State of West Virginia, in and for the body of the county of _____, upon their oaths present that A_____, *on the* _____ *day of* _____, *19*_____, in the county of _____, did unlawfully (or unlawfully and feloniously, as the case may be) (here describe the offense in the language, purport or tenor or the statute as near as may be), against the peace and dignity of the State...

W.Va. Code §62-9-1 (1931 Code, §62-9-1) (emphasis added). The State of West Virginia chose to ignore a form indictment that would have not been challengeable in the instant proceeding and therefore, it should pay the price for its neglect.

1988 or if it was acceptable for him to report on August 31, 1991. Since time is of the essence is a failure to appear charge, no person could really know which date he was required to appear on by simply reading the indictment.

The other problem with the indictment is that it states that Petitioner was not required to report "... until the matter [was] finally terminated..." (See Exhibit A, at Attachment 1). The State interpreted that language to mean that Petitioner was required to report to jail on July 20, 1988, when Petitioner's Petition for Appeal was denied. (See Exhibit B, at pp. 198 - 200 and Exhibit A, at Attachment 4). The State of West Virginia, however, ignored the fact that Petitioner's appellate process was not "finally terminated" pursuant to the Bond issued to Petitioner.

On July 22, 1988, appellate counsel sent a letter to the Clerk of the West Virginia Supreme Court of Appeals requesting that Petitioner's Petition be renewed. (See Exhibit A, at Attachment 6). That request for renewal was filed under Rule 7(b) of the West Virginia Rules of Appellate Procedure, which states:

> A petitioner desiring to renew a petition may notify the Clerk of the Supreme Court of his intention in writing within thirty days after entry of the order denying his application. In such case, the Clerk shall retain the petition and record in the Supreme Court, the petition may be reheard in accordance with Rule 5, and an amended petition or supplemental argument may be filed.

On September 8, 1988, the West Virginia Supreme Court of Appeals issued an Order denying the Petitioner leave to present a second application because it was filed "out of time." (See Exhibit A, at Attachment 7). *Consequently, Petitioner's appellate matter was not "finally terminated" until September 8, 1988* pursuant to Rule 7(b) of the West Virginia Rules of Appellate Procedure and Petitioner could not possibly have been required to appear prior to that date. Notwithstanding that

fact, the State of West Virginia issued a capias for Petitioner's arrest on July 27, 1988, five days after the renewal of petitioner was mailed. (See Exhibit A, at Attachment 5). The State of West Virginia then re-indicted Petitioner alleging that he failed to appear beginning "on or about" July of 1988 even though it surely knew that Petitioner's appellate remedies had not been exhausted. The unavoidable conclusion from those facts is that Petitioner was charged with a crime before it could have been legally committed. No evidence can remedy that fatal flaw in the indictment.

In reading the cases cited above referring to the terms "on or about", the challenged indictments consistently refer to a specific date. In the case sub judice, there is an indictment alleging "on or about" a span of time that exceeds three (3) years. Part of that time (July 1, 1988 through September 8, 1988) could not have even been alleged in the indictment because no crime had been committed. As such, the wording of Petitioner's indictment flies in the face of the law of West Virginia as well as every other jurisdiction cited above and it cannot be allowed to stand. Simply put, the ends (Petitioner's conviction) does not just the means (illegal indictment), when the law is clear on this subject. Certainly, the courts of this country would not permit conviction to stand if based upon illegally seized or fabricated evidence because the ends simply do not justify the means in getting there. If the law is to have any meaning, it must be strictly applied according to the way it is written or there is no point in having law at all. Accordingly, this Court should rule that Petitioner's indictment was defective, that he is being illegally held and that his immediate release should be ordered.

**III.** **Petitioner's Sixth and Fourteenth Amendment rights were violated when the Circuit Court of Raleigh County misapplied the law in refusing to strike two (2) Juror for cause thereby forcing Petitioner to use two (2) of his peremptory challenges.**

It is well settled that the Sixth and Fourteenth Amendments guarantee a criminal defendant the right to an impartial jury. Ross v. Oklahoma, 487 U.S. 81, 85, 108 S. Ct. 2273 (1988); Irvin v. Dowd, 366 U.S. 717, 722 (1961). It is also well settled that the Fourteenth Amendment West Virginia Code §62-3-4 provides:

> No challenge of a juror other than that provided for in the preceding section [§ 62-3-3] shall be allowed the State or the accused, *except for cause*, and all challenges shall be tried by the court in which they are made.

W.Va. Code §62-3-4 (emphasis added).

During the pre-trial proceedings in Case No. 92-F-342, Petitioner filed a motion in limine to exclude evidence of Petitioner's second degree sexual assault conviction. Although the Circuit Court of Raleigh County ruled that evidence of his conviction could be admitted for purposes of satisfying the elements of West Virginia Code § 62-1C-17b, the Circuit Court granted the motion to the extent that details of the crime were not admissible. (See Excerpt from 3/12/93 pre-trial hearing attached hereto as Exhibit E, at p. 35). One of those details was that the victim of the second degree sexual assault was retarded. (See Excerpt from 3/22/93 pre-trial hearing, attached hereto as Exhibit F, at p. 36). Unfortunately, the Circuit Court's ruling was violated when a jury was selected. Furthermore, Petitioner was denied his right to strike two (2) jurors for cause.

At the beginning of jury selection, twenty (20) potential jurors were impaneled. (See Jury Selection from 3/22/93 trial, attached hereto as Exhibit G, at p. 43 - 45). During voir dire, it became apparent that Juror Hale had some knowledge of the fact concerning Petitioner's conviction for

second degree sexual assault.  As a result of the knowledge, Juror Hale was asked:

> Mr. Noggy:  Okay.  With - - and I know it's tough to be detailed on
> what you read, but could you relate to the Court what it was, as much
> as you can remember, what the article said.
>
> Prospective Juror Hale:  Not really.  I mean, I remember reading the
> article I assume at the time that the charges were brought against him.
>
> Mr. Noggy:     Okay.
>
> Prospective Juror Hale:  Okay, and from my just trying to remember,
> that it was sexual assault against a retarded girl.

(See Exhibit G, at p. 99).  Because that knowledge violated the Court's pre-trial ruling on the

admissibility of the circumstances surrounding the second degree sexual assault, trial counsel moved

the Court to strike Ms. Hale for cause.  (See Exhibit G, at pp. 103 - 104).  Sadly, the Court denied

Petitioner's motion stating that:

> The Court is, of course, here burdened.  If I had the luxury of having
> a substantial number or jurors, I might, out of a great precaution, have
> this person excused for cause because of that information.  But I don't
> have that luxury as we stand here now.

(See Exhibit G, at p. 105).  By refusing to strike Juror Hale for cause, the Circuit Court violated its

own ruling that evidence surrounding the sexual assault was inadmissible.

    Juror Boling was also questioned out of the presence of the jury because she had been the

victim of a previous sexual assault when she was three (3) years old.  (See Exhibit G, at p. 108).

During her questioning, the following exchange took place:

> The Court: I see.  How does the fact that in this case, that you now
> know that Mr. Azeez was charged and convicted of sexual assault in
> 1987, and that you have had the experience that you recited about
> sexual assault upon you at the age of three and therapy through the
> years, does that in any way prejudice you in your effort to sit here as
> a member of this jury and be impartial in this case?

Prospective Juror Boling: Probably not, if I knew the age of the victim. If there was - -

The Court: If you did learn the age of the victim, or some other fact that would show as to that victim - -

Prospective Juror Boling: *And - - and know that he was convicted without a shadow of a doubt that - - you know, to know that he was convicted and had done it, it would be hard for me.* But that's not what he's being tried for, is it?

The Court: No, he's - -

Prospective Juror Boling: And that's the part that's confusing me.

(See Exhibit G, at p. 109) (emphasis added). Juror was then asked:

Mr. Noggy: You feel completely comfortable sitting in this - - sitting on a jury that - - knowing that the man was convicted of that charge? You feel comfortable still sitting on the jury and making a decision where you're having to presume this man as completely innocent until the State proves him guilty; you don't have any difficulty sitting on that type of jury.

Prospective Juror Boling: Well, I might - - yes, I might feel uncomfortable.

(See Exhibit G, at pp. 110 - 111). Because of Juror Boling's statements and past experience as a victim of sexual assault, trial counsel moved the Circuit Court to strike Juror Boling for cause, but again, the Circuit Court denied the motion. However, in denying the motion, the Circuit Court stated:

... And it worries me that she would indicate that if a child was abused, that it might give her some consideration and, of course, if there was any way she would learn that it is alleged a retarded person was sexually assaulted, it might be of some pause to her.

But here's the problem we sit with here and now. *We have no more jurors. It's up to the discretion of the Court that I try to have from other panels called in jurors, and to delay the beginning of the trial*

24

> *until we can have sufficient persons here to offer a optimal selection,* and go through this same thing - - procedure in order to accommodate your request.

(See Exhibit G at pp. 114 - 115) (emphasis added).  The Court then stated that it is:

> ... compelled to rule and the Court has, acting in discretion.  *I agree with you that if I had the luxury of many persons here, out of an abundance of precaution, because of that which I have heard, I would excuse the jurors and have others drawn.*  But I cannot do that without trying to summon jurors from other judges' panels in - - who, probably have not been noticed that they would be called upon to come in, thereby delaying this trial for an unknown length.  The Court at this time, with a panel of 23 persons seated there to serve as jurors in this case, having had to excuse two others here and some others that did not show up even without notice of the Court.
>
> *... And while, in order to assure a absolutely, on the surface, fair trial that we would delay this matter to have during the noon hour the clerk try to bring in sufficient jurors with no possible concept of when we could start, I'm going to deny the motion to excuse these two jurors for cause.*
>
> *It may be that that is the very ground for reversal of this case...*

(See Exhibit G, at pp. 117 - 118) (emphasis added).  As a consequence of the Court's refusal to strike Juror Hale and Juror Boling for cause, they were ultimately struck under the peremptory provisions of West Virginia Code § 62-3-3.  (See Exhibit G, at p. 125).  Those peremptory challenges, however, should not have had to been used.

In State v. Phillips, 194 W.Va. 569, 461 S.E.2d 75 (1995), Justice Cleckley wrote an opinion for the West Virginia Supreme Court of Appeals that bears directly on the case sub judice.  In Phillips, the defendant asserted that two (2) of his jurors should have been struck for cause as they admitted during voir dire that evidence of adultery might have a negative impact on their deliberations.  That motion was denied by the trial court and on appeal, the defendant made two arguments.  First, the defendant argued that he was denied an impartial jury panel.  Second, the

25

defendant argued that because he was required to use two (2) of his peremptory challenges on the two (2) allegedly disqualified jurors, he was denied his statutory right to six (6) peremptory challenges. Id., at 586.

 With respect to the first argument, the Phillips Court held that:

> ... a trial court's failure to remove a biased juror from a jury panel does not violate a defendant's right to a fair trial by an impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Section 14 of Article III of the West Virginia Constitution. In order to succeed in a claim that his or her constitutional right to an impartial jury was violated, a defendant must affirmatively show prejudice.

Id., at 587. Since the defendant did not assert that the jury that finally tried him was biased or prejudiced, the West Virginia Supreme Court of Appeals concluded that he had not shown any prejudice from the trial court's denial of his challenges for cause. Id. That ruling, however, did not stop the Court's analysis.

 In looking at the defendant's second argument, Justice Cleckley found that it raised two questions: "(1) What effect does a trial court's erroneous ruling on a challenge for cause have on a defendant's statutory right to a bias-free panel; and (2) does the dilution of peremptory challenges from such error entitle a defendant to reversal?" Id. In answering these questions, Justice Cleckley noted that "... our State law does not make a specific qualification that peremptory challenges be used to cure a trial court's errors." Id., at 588. To the contrary, West Virginia Code § 62-3-3 (1949), unequivocally states that "a defendant is entitled to a panel of twenty jurors, *free from exception*, before he or she is called upon to exercise peremptory challenges." Id. Justice Cleckley then noted that "[w]e have found 'if proper objection is raised at the time of impaneling the jury, it is reversible error for the court to fail to discharge a juror who is obviously objectionable." Id., citing, State v.

West, 157 W.Va. 209, 219, 200 S.E.2d 859, 866 (1973).  Furthermore, Justice Cleckley stated that

in State v. Wilcox, 169 W.Va. 142, 144, 286 S.E.2d 257, 259 (1982), the Court noted that "...

*denying a valid challenge for cause of a jury panel member is reversible error 'even if the*

*disqualified member is later struck by a peremptory challenge*.'" Id., at 588 (emphasis added).

Consequently, the Phillips Court held that if a defendant validly challenges a prospective juror for

cause and the trial court fails to remove the juror, reversible error results even if the defendant

subsequently uses his peremptory challenge to correct the trial court's error. Id. Since the trial court

determined that the witnesses could serve impartially, Justice Cleckley concluded that the only

remaining question was whether the jurors should have been removed for bias.  No definitive

decision was made on that issue as the case was reversed on other grounds, but Justice Cleckley did

offer guidance. Id.

     According to the law in this state, "[t]he true test of whether a juror is qualified to serve on

the panel is whether he or she can render a verdict solely on the evidence without bias or prejudice

under the instructions of the court." Id., at 588, citing, State v. White, 171 W.Va. 658, 301 S.E.2d

615 (1983); State v. Neider, 170 W.Va. 662, 295 S.E.2d 902 (1982); State v. Beck, 167 W.Va. 830,

286 S.E.2d 234 (1981).  When trial court's ruling on a challenge for cause is reviewed, it is for abuse

of discretion. Id., at 589 (citations omitted).  However, according to Justice Cleckley, "... our cases

demonstrate that a trial court risks error only when it refuses to strike jurors whose impartiality is

questionable." Id.

     One year after the Phillips decision, the West Virginia Supreme Court of Appeals held that

"[a]ctual bias can be shown either by a juror's own admission of bias or by proof of specific facts

which show the juror has such prejudice or connection with the parties at trial that bias is presumed."

Syl. pt. 5, <u>State v. Miller</u>, 197 W.Va. 588, 476 S.E.2d 535 (1996).  The <u>Miller</u> Court also held that:

> The relevant test for determining whether a juror is biased is whether the juror had such a fixed opinion that he or she could not judge impartially the guilt of the defendant. Even though a juror swears that he or she could set aside any opinion he or she might hold and decide the case on the evidence, a juror's protestation of impartiality should not be credited if the other facts in the record indicate to the contrary.

<u>Id.</u>, at Syl. pt. 4.  Applying those standards to the case sub judice, it is clear that the Circuit Court of Raleigh County abused its discretion and denied Petitioner his right under West Virginia Code § 62-3-3 (1949), to have a panel of twenty (20) jurors, free from exception, before he was called upon to exercise peremptory challenges.  Rather, Petitioner was forced to correct the trial court's error in denying his motions to strike for cause by utilizing his peremptory challenges.  That problem calls for relief.

In the case sub judice, the Circuit Court of Raleigh County ruled that the jury was not to be advised of the circumstances surrounding Petitioner's conviction for second degree sexual assault. Despite that ruling, the Circuit Court would not excuse a juror for cause even though that juror knew the victim was mentally retarded.  The only real rationale behind that decision was that there were no other jurors available such that the trial could start that very day.  Likewise, the Circuit Court refused to strike a juror for cause who had been the victim of a sexual assault when she was three (3) years old.  When asked if anything would affect her ability to judge the case, the juror indicated that age might be a factor.  Certainly, knowledge of the victim's disability, which could have easily been disclosed by Juror Hale, created a situation where bias could play a significant role in Juror Boling's deliberations.  Furthermore, Juror Boling's own experience as a victim of a sexual assault would have invariably come into play when deciding the fate of a person that had been convicted of

sexual assault.  Nevertheless, the Circuit Court refused to excuse Juror Boling for cause simply

because it would have been an inconvenience to the Court to obtain replacement jurors.  Amazingly,

the Circuit Court of Raleigh County even recognized that it might be committing reversible error,

yet it rendered its rulings merely out of convenience rather than absolute fairness to Petitioner, which

he deserved.  As a result of the Circuit Court's erroneous denial of Petitioner's motions, he was

denied all of the peremptory challenges afforded to him under West Virginia Code §62-3-3.  The

West Virginia Supreme Court of Appeals' holding in Phillips and the fair trial mandate of the

Fourteenth Amendment require a reversal as Petitioners' conviction as violative of his statutory

rights.

     While in United States v. Martinez-Salazar, 528 U.S. 304, 120 S. Ct. 774 (2000), the

Supreme Court ruled that the use of peremptory challenges to cure a trial court's error does not rise

to a Federal Constitution dimension, the Court also stated:

> In conclusion, we note what this case does not involve. ***It is not
> asserted that the trial court deliberately misapplied the law in order
> to force the defendants to use a peremptory challenge to correct the
> court's error***. See Ross, 487 U.S. at 91, n. 5. Accordingly, no
> question is presented here whether such an error would warrant
> reversal. Nor did the District Court's ruling result in the seating of any
> juror who should have been dismissed for cause. As we have
> recognized, that circumstance would require reversal. See 487 U.S.
> at 85...

Id., at 782 (emphasis added).  In the case sub judice, this Court is presented with the situation noted

by the Martinez-Salazar Court in that the Circuit Court of Raleigh County knew that it should have

struck Juror Hale and Juror Boling but deliberately misapplied the law just so there would be enough

jurors to have the trial on that date.  That conduct is of a constitutional dimension because Petitioner

was denied due process and a fair trial.  In other words, the Circuit Court of Raleigh County knew

that if it struck Juror Hale and Juror Boling for cause, then there would not have been enough Jurors

to afford the State and Petitioner with their statutorily allotted peremptory challenges.  Therefore,

the Circuit Court refused to strike two (2) Jurors, which the Court admitted should be struck, in order

to proceed with the trial.  That action was not based upon the Court's conclusion that the Jurors were

unbiased despite one Juror's knowledge of the underlying facts and another Juror's own experience

with sexual assault, but rather, the Court's action was based upon a desire to get Petitioner tried on

schedule.  There is simply no justification for the Court's refusal to call other Jurors or to continue

the case so that Petitioner could obtain "... a panel of twenty jurors, ***free from exception***, before he

[was] called upon to exercise peremptory challenges." <u>Phillips</u>, at 588 (emphasis added).  Since the

Circuit Court misapplied the law in order to get Petitioner tried before Christmas and since that

conduct forced Petitioner to use peremptory challenges that he might have used otherwise, there was

in fact, an error of Federal Constitutional dimension as described by the United States Supreme

Court in <u>United States v. Martinez-Salazar</u>, 528 U.S. 304, 120 S. Ct. 774 (2000) and  <u>Ross v.

Oklahoma</u>, 487 U.S. 81, 108 S. Ct. 2273 (1988).

>    **IV.    Petitioner's Fifth and Fourteenth Amendment rights were violated when
>    the Circuit Court of Raleigh County refused to declare a mistrial or give
>    a curative instruction to the Jury when Petitioner's previous attorney
>    testified against him and offered testimony that was barred by the
>    Circuit Court.**

**A.    Attorney-client privilege:**

Every person charged with a crime in this country is entitled to a fair trial under the Fifth and

Fourteenth Amendments to the United States Constitution.  Under the Fifth and Fourteenth

Amendment, the government and the State shall not "...deprive any person of life, liberty, or

property, without due process of law."  Without question, the attorney-client privilege is protected

under those amendments.  In fact, the United States Supreme Court has recognized "... the attorney-client privilege under federal law, as 'the oldest of the privileges for confidential communications known to the common law.'" United States v. Zolin, 491 U.S. 554, 562, 109 S. Ct. 2619 (1989), quoting, Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). The central concern of that privilege is to "... encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn, 449 U.S., at 389.  Furthermore, "[t]hat purpose, of course, requires that clients be free to 'make full disclosure to their attorneys' of past wrongdoings, Fisher v. United States, 425 U.S. 391, 403 (1976), in order that the client may obtain 'the aid of persons having knowledge of the law and skilled in its practice,' Hunt v. Blackburn, 128 U.S. 464, 470 (1888)." Zolin, at 562.  If a person cannot rely upon the attorney-client privilege then he or she is deprived of a fair trial in two (2) ways. First, the accused cannot prepare an adequate defense because he or she will be afraid to discuss the case openly with an attorney.  Second, the attorney will be subject to compelled testimony regarding communications with the client.  Therefore, the Fifth and Fourteenth Amendments require that attorney-client communications be privileged unless some exception applies.

In the case sub judice, Petitioner was deprived his right to a fair trial under the Fifth and Fourteenth Amendments when the prosecution improperly used a violation of the attorney-client privilege to convict Petitioner.  Petitioner's rights were further violated when the Circuit Court of Raleigh County failed to remedy the unfairly prejudicial introduction of privileged information. Without the introduction of privileged information, the Jury would have only been able to speculate as to Petitioner's reasons for not appearing.  However, because of a violation of the attorney-client privilege by appellate counsel, Francis Curnutte, Esquire, the Jury was presented with evidence that

provided a basis for finding the requisite intent necessary for a conviction.

Petitioner hired Francis Curnutte, Esquire, to represent him in an appeal of his conviction for second degree sexual assault. Mr. Curnutte was able to obtain Petitioner's release on bond pending appeal on November 5, 1987, and Mr. Curnutte filed Petitioner's Petition for Appeal on May 24, 1988. Sadly, appellate counsel filed the petition nine (9) months after the Circuit Court of Raleigh County entered a conviction order. Therefore, Mr. Curnutte did not provide oral arguments which were requested and paid for by the Petitioner. (See Exhibit A). On July 20, 1988, the West Virginia Supreme Court of Appeals denied Petitioner's Petition for Appeal. (See Exhibit A, at Attachment 4). Two (2) days later, appellate counsel filed a request for renewal of petition. (See Exhibit A, at Attachment 6). That request was rejected by the West Virginia Supreme Court of Appeals Order dated September 8, 1988. (See Exhibit A, at Attachment 7). Inexcusably, appellate counsel was late in filing Petitioner's Petition for Appeal, but the most egregious conduct on the part of appellate counsel came when Petitioner was tried for failing to appear.

Prior to his trial for failure to appear, it was learned that the State of West Virginia intended to call Francis Curnutte, Esquire, as its chief witness. Since his appearance as a witness raised obvious ethical questions, Petitioner's trial counsel filed a motion to exclude that witness. On March 12, 1993, the Circuit Court of Raleigh County addressed the motion and ruled that Mr. Curnutte could not be called by the State during its case-in-chief to prove Petitioner's intent to unlawfully flee. (See Excerpt from 3/12/93 pre-trial hearing attached hereto as Exhibit H, at pp. 66 - 70). However, Petitioner wrote a letter to his appellate counsel, dated March 8, 1993, advising Mr. Curnutte that Petitioner was not waiving the attorney-client privilege and that if counsel violated the privilege, he would be held accountable. (See Exhibit A, at Attachment 11). Based upon the contents of that

letter, the Court ruled that the State could introduce the letter in its case-in-chief, but that Mr. Curnutte still could not offer testimony regarding his conversations with Petitioner while he still represented Petitioner during the appeal process. (See Exhibit H, at pp. 74 - 75).

Mr. Curnutte should have never turned the letter over to the prosecuting attorney. (See Exhibit H, at p. 50 and Exhibit B, at p. 224). That letter was written by Petitioner to his appellate counsel and it related directly to counsel's representation of Petitioner during the appellate process. While the letter was portrayed to be a threat in an effort to circumvent the privilege, there is nothing threatening about reminding counsel of his ethical obligation to maintain the attorney-client privilege nor is there anything threatening about requesting counsel to tell the truth in the event he decided to violate the privilege.

Rule 1.6 of the West Virginia Rules of Professional Conduct prohibited Mr. Curnutte from "... revealing information relating to representation of a client..." Petitioner's March 8, 1993 letter unequivocally related to appellate counsel's representation yet counsel disclosed the letter to the prosecuting attorney and it was used as evidence against Petitioner. In reviewing the letter, the Circuit Court mistakenly believed that simply because Mr. Curnutte no longer represented Petitioner, that the letter was not privileged. (See Exhibit H, at p. 52). However, the comments to Rule 1.6 state that, "[t]he duty of confidentiality continues after the client-lawyer relationship has terminated." Likewise, the West Virginia Supreme Court of Appeals has long held that a communication to an attorney by his client, or former client, dealing with their relation as attorney and client is privileged. State v. Fisher, 126 W.Va. 117, 27 S.E.2d 581 (1943). Therefore, Mr. Curnutte violated that attorney-client privilege by turning the letter over to the prosecuting attorney for evidence. Without that letter, the State would have been left without a critical piece of evidence because the letter could

be easily held against Petitioner when in the hands of a zealous prosecuting attorney.

Notwithstanding the disclosure of the letter, Mr. Curnutte doomed Petitioner to conviction when he was called to testify during trial. During direct examination, the prosecuting attorney introduced the following evidence:

> Q.      ... Now, in July of 1988, about a year after his July of '87 conviction, were you notified by the Circuit Court as to the outcome of their ruling on your petition for appeal?
>
> A.      I was notified by the Supreme Court. Ordinarily what happens when you petition for appeal, what you're asking the Supreme Court to agree to hear your appeal. If they agree to hear the appeal, briefing schedules are set and it's argued before the Court.
>
>  If the Court declines to hear your petition, it means that, for whatever reason, they do not think the arguments are meritorious enough to have the full appeal process. Ordinarily the clerk of the Supreme Court will call the attorney and say your petition was either accepted or it was rejected and give you the vote.
>
>  In this instance, I believe I was out of town and I did not hear from the clerk. ***The first time I heard about the rejection of the petition was from Mr. Azeez.***

(See Exhibit B, at p. 217 - 218) (emphasis added). Mr. Curnutte was then asked:

> Q.      Now, once the petition for appeal is rejected, then, as counsel for Mr. Azeez, can you tell that - - or - - and as a criminal lawyer, what then is the status of the $25,000.00 bond?
>
> A.      ***That bond is of no effect once the appeal is rejected, because your rights have been exhausted.*** And if you are - - if a person is convicted and the appeal is rejected, then the person is no longer on bond.

(See Exhibit B at, p. 218) (emphasis added). The problem with that testimony is three-fold.

First, Mr. Curnutte violated the attorney-client privilege by offering testimony regarding a conversation he had with Petitioner.  Trial counsel brought that problem to the Court's attention and moved for a mistrial, but after the prosecuting attorney responded, the Circuit Court replied:

> The question you asked him caused from this witness that answer that - - did you hear - - I heard from Mr. Azeez as to the rejection of the appeal.  That's what is being complained about here.  And that was elicited and that was testified about.  ***All right, we've heard that. And that is not within the - - the ruling of the Court as to the communications by this gentleman, Mr. Azeez, to his counsel.  So we have that error here, now.***
>
> ***Now, I have two options.  We're either with it in term of it, to go to one.  One, we would consider whether or not it is a concept of mistrial; or, two, whether I instruct the jury to ignore the matter and tell them the red-eyed elephant in the corner.  I have those two options that are here, now...***

(See Exhibit B, at p. 220).  Counsel then argued about which option should be selected and the prosecuting attorney said, "Okay, I'm sorry[]" about violating the Court's order regarding privileged communications.  Despite the acknowledged error, the Circuit Court refused to grant a mistrial.  (See Exhibit B, at pp. 221 - 222)[7].  The Court, however, did admonish the prosecuting attorney not to ask any further questions about the conversation with Petitioner and appellate counsel.  (See Exhibit B, at p. 223).  However, the prosecuting attorney ignored the Court's admonishment and asked:

---

[7] The Court stated on the record:

> ... I agree that it should not have been called to the attention of the jury, which is the only other manifestation I can make at this time. The error, if it is an error, has been committed.  It does - - it is violative of the Court's instruction...

(See Exhibit B, at p. 222).

> Q.    Now, at the time you received that letter, approximately how long had it been, just in terms of time, since you last heard from your client, Jamal Azeez?
>
> A.    Several years.

(See Exhibit B, at p. 224). That question and answer again placed the 1988 conversation between Petitioner and Mr. Curnutte in front of the jury and it again reminded the jury that according to Mr. Curnutte, he discovered the petition's denial from Petitioner. Nothing was ever done about that violation of the Court's order. Therefore, Petitioner's Fourteenth Amendment rights were violated when the prosecuting attorney violated the Court's Order because privileged information became a critical piece of evidence in establishing Petitioner's intent. The prosecuting attorney's second violation of the Court's order amounts to prosecutorial misconduct and as the Supreme Court has noted: "...prosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process." Greer v. Miller, 483 U.S. 756, 107 S. Ct. 3102 (1987), quoting, Donnelly v. DeChristoforo, 416 637, 643 (1974). "To constitute a due process violation, the prosecutorial misconduct must of 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" Id., quoting, United States v. Bagley, 473 U.S. 667, 676 (1985), quoting, United States v. Agurs, 427 U.S. 97, 108 (1976).

**B.    Failure to remedy the error:**

The second problem with appellate counsel's testimony is that the Circuit Court never declared a mistrial nor did it give the Jury a curative instruction. (See Exhibit A). In Sheppard v. Maxwell, 384 U.S. 333, 86 S. Ct. 1507 (1966), the United States Supreme Court held that the "[i]dentifiable prejudice to the accused need not be shown if, as in Estes v Texas, 381 U.S. 532,... the totality of the circumstances raises the probability of prejudice." Id., at Syllabus. That rule is

in effect so as to promote the Supreme Court's repeated goal of not allowing anyone to be "... punished for a crime without 'a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power.'" Id., at 350, quoting, Chambers v. Florida, 309 U.S. 227, 236-237 (1940).   Thus, while in most cases involving claims of due process deprivations, a showing of identifiable prejudice is required, "... at times, a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in process." Id., at 352; Estes, at 542-543.  Without such a principle, an unfair trial may stand when "... our system of law has always endeavored to prevent even the probability of unfairness." Id. (approvingly citing the language of In re Murchison, 349 U.S. 133, 136 (1955).

In this case, there is certainly an identifiable prejudice because of the violation of the attorney-client privilege and because of the Circuit Court's failure to take any remedial action. Coupled with the totality of the circumstances regarding the nature of Petitioner's alleged offense and the proof required to obtain a conviction, there can be no doubt that Petitioner received an unfair trial of constitutional dimensions.

This Court should take notice of Justice Douglas' dissent in Massey v. Georgia, 401 U.S. 964, 91 S. Ct. 984 (1971), as he provides an analysis that should be adopted in this matter.  In Massey, Justice Douglas dissented to the Supreme Court's denial of certiorari concerning the admission of testimony by a court-appointed psychiatrist.  Essentially, the petitioner's court-appointed psychiatrist was called by the prosecuting attorney to offer testimony regarding a conversation the petitioner had with the psychiatrist about an armed robbery.  Defense counsel moved to strike the testimony under the psychiatrist-patient privilege, but the trial court denied the motion and the Supreme Court of Georgia affirmed that ruling.  According to the Supreme Court of

Georgia:

> The psychiatrist appointed by the court for a sanity examination of the
> defendant may not be regarded as a prosecution witness, but is instead
> a witness for the court...  Hence, the requisite relationship did not
> exist and it was not error to admit in evidence the psychiatrist's
> testimony as to statements made to him by the defendant during the
> course of his examination of the defendant.

In response to the Supreme Court's denial of certiorari, Justice Douglas stated:

> ***Would not abolishing the attorney-client privilege for indigents who
> had court-appointed counsel violate both the Sixth and Fourteenth
> Amendments?  Compare Gideon v. Wainwright, 372 U.S. 335, with
> Douglas v. California, 372 U.S. 353.  If so, why is the psychiatrist-
> patient privilege different?  Can the pschiatrist-patient privilege be
> constitutionally limited to those with money relationships?  Does
> 'the kind of trial a man gets depend on the amount of money he
> has?  Griffin v. Illinois, 351 U.S. 12, 19.***

Id., at 965 (emphasis added).  Justice Douglas then concluded his dissent with the opinion that "[h]ad

petitioner been able to hire his own psychiatrist, his trial chances would not have been as abruptly

crushed on rebuttal as they were here."  Furthermore, Justice Douglas concluded that at the trial

level, as opposed to many cases decided by the Supreme Court, petitioner's "... alleged denial of

equal protection was destroyed..." Id., at 966.  In the case sub judice, we are not dealing with an

equal protection issue between indigent criminal defendants and those that can hire their own

psychiatrists.  Rather, we are dealing with a question of a fair trial under the due process clause of

the Fourteenth Amendment.  However, Justice Douglas' analysis is very useful because the Circuit

Court of Raleigh County essentially abolished the attorney-client privilege by refusing to declare a

mistrial or provide a curative instruction to the Jury after appellate counsel and the prosecuting

attorney introduced privileged information despite the Circuit Court's pre-trial prohibition.

      Curative instructions have often been employed as a means of correcting the prejudicial effect

of inadmissible evidence.  However, the Circuit Court of Raleigh County did not give a curative

instruction to the Jury, which the Supreme Court has recognized as being a method of protecting an accused's constitutional rights when inadmissible evidence has been introduced. Frazier v. Cupp, 394 U.S. 731, 735-736, 89 S. Ct. 1420 (1969); See also, Greer v. Miller, 483 U.S. 756, 107 S. Ct. 3102 (1987) (noting that curative instruction remedied improper questioning by the prosecuting attorney). That failure alone violates Petitioner's Fourteenth Amendment rights, but even if the curative instruction had been given, the United States Supreme Court has recognized that "[i]t may be that some remarks... could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable." Id., at 736. Unequivocally, the calling of Petitioner's lawyer and his offering of privileged information against his own client could not be any more condemning. All the Jury had to do was to hear Mr. Curnutte say that he first heard of the appeal's rejection from Petitioner in order for it to conclude that Petitioner fled to avoid his sentence. Mr. Curnutte made matters worse when he testified that it had been years since he heard from Petitioner after the July of 1988 communication. If appellate counsel had not breached the privilege by offering testimony regarding his communication with Petitioner, then the Jury would not have had evidence showing Petitioner's intent. All the Jury would have had was a letter from Petitioner reminding appellate counsel of his ethical obligation to keep communications privileged, which appellate counsel violated when he turned the letter over to the prosecuting attorney. If there is any doubt about the prosecuting attorney's reliance upon Mr. Curnutte's violation of the attorney-client privilege in obtaining Petitioner's conviction, that doubt can be laid to rest through reading her closing statement. As can be seen from the statement, the prosecuting attorney entirely hinges the element of intent on the letter Mr. Curnutte turned over and his violation of the attorney-client privilege. (See Exhibit B, at pp. 529 - 552). Mr. Curnuttes violation of the attorney-client privilege and the resulting

inaction of the Circuit Court of Raleigh County combined to deprive Petitioner of a fair trial and for that reason, he should be released. In fact, the United States Supreme Court has had occasion to reverse a conviction when privileged information was used against a defendant.

In <u>Alexander v. United States</u>, 138 U.S. 353, 11 S. Ct. 350 (1891), a defendant challenged his murder conviction alleging improper impaneling of the jury, exclusion of testimony and violation of the attorney-client privilege. In that case, the defendant went to an attorney and revealed information about his business relationship with the decedent, who was missing. According to the Court, that information could have had a tendency to show that the defendant intended to defraud his partner's estate and profit from his death. At trial, the attorney was called as a witness against the defendant and over his objection, the attorney offered testimony about the defendant's communications with the attorney. <u>Id.</u>, at 357-358.

In analyzing the question before it, the Supreme Court noted that the consultation occurred after the crime had been committed and that "[h]ad the interview... been held for the purpose of preparing his defence, or even for devising a scheme to escape the consequences of his crime, there could be no doubt of its being privileged..." <u>Id.</u>, at 360. The Court then concluded that the defendant's statement that his partner was missing and that he had not heard from him was privileged as it was material and relevant to the charge of murder. Accordingly, the lower court's decision was reversed. <u>Id.</u> In the case sub judice, Francis Curnutte, Esquire, offered testimony that the Circuit Court of Raleigh County had recognized as privileged. Nevertheless, the Circuit Court refused to declare a mistrial and it refused to provide a curative instruction to the Jury. Accordingly, <u>Alexander</u> mandates that Petitioner's conviction be overturned.

Finally, appellate counsel destroyed any last hope Petitioner had in obtaining an acquittal when he advised the Jury that upon the denial of the Petition for Appeal, the "... ***bond [was] of no effect... because [Petitioner's] rights [had] been exhausted.***" (See Exhibit B, at p. 218).  That statement was clearly wrong because the bond stated that Petitioner did not have to turn himself in "... until the matter [was] finally terminated..."  Just two (2) days after Petitioner's Petition for Appeal was rejected, appellate counsel sent a letter renewing his client's petition pursuant to Rule 7 of the West Virginia Rules of Appellate Procedure.  (See Exhibit A, at Attachment 6).  That request was not rejected until ***September 8, 1988***.  (See Exhibit A, at Attachment 7).  Therefore, Petitioner had not exhausted all of his rights as of July of 1988 and appellate counsel either perjured himself or made a grievous error in answering the prosecuting attorney's question.  Either way it is viewed, appellate counsel's testimony was wrong and when combined with violation of the attorney-client privilege, Petitioner never stood a chance of receiving a fair trial.

In the end, a multitude of errors just in admitting Francis Curnutte's testimony worked to deprive Petitioner of a fair trial.  One, the prosecuting attorney violated the Court's Order by eliciting improper and privileged testimony.  The prosecuting attorney also used a defective indictment and misled everyone about the date Petitioner was actually supposed to report.  Two, Petitioner's appellate counsel violated the attorney-client privilege by sending Petitioner's letter to the prosecuting attorney and by revealing the content of privileged telephonic communications. Finally, the trail court violated Petitioner's rights by improperly impaneling a jury and by refusing to declare a mistrial or provide a curative instruction to the Jury regarding privileged evidence that should not have been introduced.  Those errors warrant relief.

**V.      Petitioner's Fourteenth Amendment rights were violated when his criminal file was lost for two years thereby depriving him and his counsel of access to critical materials for his appeal and Petition for Writ of Habeas Corpus.**

After Petitioner was convicted for failing to appear, that conviction was appealed to the West Virginia Supreme Court of Appeals.  When the West Virginia Supreme Court of Appeals refused the Petition for Appeal, Petitioner filed a pro se Writ Of Habeas Corpus By A Person In State Custody in the Circuit Court of Raleigh County.  That petition was filed on March 18, 1996.  On May 16, 1996, the Circuit Court of Raleigh County appointed James G. Anderson, III, Esquire, to represent Petitioner in his state habeas corpus proceeding.  (See Exhibit A).  In representing Petitioner, it is obvious that counsel needed access to Petitioner's criminal file, but that file could not be found in the Circuit Clerk's office. Astonishingly, Petitioner's file was not found until two (2) years later.  When the file was found in March of 1998, it was located in Judge H. L. Kirkpatrick's office.  (See Exhibit A).  Due to Petitioner's deprivation of his criminal file for two (2) years, neither he, nor his counsel, had the benefit of evidence in support of his Petition for Writ Of Habeas Corpus By A Person In State Custody.

There is no question that "...prisoners have a constitutional right of access to the courts." Bounds v. Smith, 430 U.S. 817, 821, 97 S. Ct. 1441  (1977).  Furthermore, "... 'adequate and effective appellate review' is impossible without a trial transcript or adequate substitute..." Therefore, "... States must provide trial records to inmates unable to buy them. Griffin v. Illinois, 351 U.S. 12, 20 (1956).  If a trial transcript is denied, reversible error is committed.  Hardy v. United States, 375 U.S. 277, 84 S. Ct. 424 (1964).  Obviously, the denial of an entire court file also amounts to a denial of access to the courts and that is what happened in the case sub judice.

Petitioner has alleged that his indictment was defective, fraudulently obtained and based upon perjured testimony. Petitioner has further alleged that he was tried in violation of the three term rule and that he was the victim of unlawful and erroneous rulings by the Circuit Court of Raleigh County. However, Petitioner was denied access to the documentary evidence in support of those allegations for a period of two (2) year while his state habeas corpus action languished on the Circuit Court's docket. If Petitioner had access to his criminal file, a summary judgment motion similar to the motion now before this Court could have been filed and this particular case may have never arisen. Petitioner was denied any meaningful access to the Circuit Court of Raleigh County though because his criminal file was missing for two years. Furthermore, anything could have been added or removed from the file during the time that it was lost and that fact has prejudiced Petitioner in seeking relief.[8] Accordingly, as Petitioner's rights have been violated by the denial of access to his criminal file, his conviction should be overturned.

### VI. Petitioner's rights were violated under the Fourteenth Amendment and the double jeopardy clause of the Fifth Amendment when he was denied one hundred and eight days of credit for time served before his conviction.

As noted above, Petitioner was arrested on August 19, 1991. Petitioner was then extradited to West Virginia on December 4, 1991. That span of time amount to one hundred eight (108) days. Unfortunately, Petitioner was never given credit for the one hundred eight (108) days he spent in jail in Florida. That fact is proven by Judge Hutchison's 1996 Order giving Petitioner credit for ninety eight (98) days of time served in 1987 as well as a Memorandum from the Huttonsville Correctional

---

[8] Petitioner contends that during those two (2) years, records such as the order 'nolling' Indictment 88-F-203 were added to the files, noting particularly, many such records were not in the files before conviction and during direct appeal. (See Exhibit A).

Center showing that the only credit Petitioner received was for the time he served in 1987.  (See Exhibit A, at Attachments 14 and 15).  Essentially, Judge Hutchison and the prison added up the days Petitioner served in 1987 and that came to ninety eight (98) days.[9]  Judge Hutchison and the prison then subtracted those ninety eight (98) days from December 4, 1991, which is the date they alleged that Petitioner was apprehended.  By subtracting ninety eight (98) days from December 4, 1991, Judge Hutchison and the prison arrived at an effective sentencing date of August 29, 1991. The problem is that Petitioner was apprehended on August 19, 1991 and he remained incarcerated in Florida for one hundred eight (108) days until he was extradited to West Virginia on December 4, 1991.  (See Exhibit A).  Therefore, Petitioner's sentence should have been calculated as follows:

1.    Petitioner is entitled to 98 days of credit from time he served in 1987 according to Judge Hutchison's 1996 Order;

2.    Petitioner is entitled to 108 days of credit for time he served in Florida in 1991;

3.    Petitioner was apprehended on August 19, 1991 rather than December 4, 1991;

4.    Subtracting the total of time served 206 days from the date of his apprehension (August 19, 1991), Petitioner's effective sentencing date should have been:    **January 26, 1991**.

Petitioner was clearly not given credit for time he served and that denial violates his rights under the Fourteenth Amendment.  In fact, this very Court stated in Holland v. Boles, 269 F. Supp. 221 (1967),

---

[9]  Petitioner was remanded to jail on July 31, 1987 upon his conviction for second degree sexual assault and he remained there until he was release on an appeal bond on November 5, 1987.  (See Exhibit A).

that:

> This Court agrees with the District Court in <u>Patton v. State of North Carolina</u>, 256 F. Supp. 225, 236 (W.D.N.C. 1966), that:
>
> ... denial of credit... for time served while in the de facto status of state prisoner is so fundamentally unfair as to constitute a violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the Constitution.

<u>Holland</u>, at 224.  Shortly after that decision, the Fourth Circuit Court of Appeals cited <u>Holland</u> in a case finding that:

> The guarantee against double jeopardy 'protects against multiple punishments for the same offense.' <u>North Carolina v. Pearce</u>, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076, 23 L. Ed. 2d 656 (1969).  Denial of credit to Wilson for the time he spent in jail from the date of his first conviction until the affirmance of his second appeal is multiple punishment. Under <u>Pearce</u>, it must be fully credited to him insofar as possible as 'punishment already exacted.'"

<u>Wilson v. North Carolina</u>, 438 F.2d 284, 286 (4th CA 1971).

In the case sub judice, there is no question of fact that Petitioner was given ninety eight (98) days credit for time served in 1987.  There is also no question of fact that the Circuit Court of Raleigh County deducted those days from December 4, 1991, the day when Petitioner was returned to West Virginia.  The problem is that Petitioner was never given credit for the one hundred eight (108) days he served in Florida (8/19/91 through 12/4/91) despite the incontrovertible evidence that Petitioner was incarcerated during that time.  By failing to give Petitioner credit for the one hundred eight (108) days he spent in Florida while awaiting extradition, he must currently serve an extra one hundred eight (108) days before his sentence will be discharged.  That situation subjects Petitioner to multiple punishments for the same offense and it is violative of his Fifth and Fourteenth Amendment rights because he either should have received the credit on his conviction for second

45

degree sexual assault or he should have received credit on his conviction for failing to appear. See also, Syl. pt.6, State v. McClain, 211 W.Va. 61, 561 S.E.2d 763 (2002) (holding that the Double Jeopardy and Equal Protection Clauses of the West Virginia Constitution require that time spent in jail before conviction shall be credited against all terms of incarceration to a correctional facility imposed in a criminal case as a punishment upon conviction when the underlying offense is bailable); Syl. pt. 1, Martin v. Leverette, 161 W.Va. 547, 244 S.E.2d 39 (1978) (holding that the Double Jeopardy and Equal Protection Clauses of the West Virginia Constitution require that credit for time spent in jail, either pre-trial or post-trial, shall be credited on an indeterminate sentence where the underlying offense is bailable).[10]  Since Petitioner was not given credit he was entitled to receive, this Court should remedy that error.  Therefore, the Respondent must forthwith subtract one hundred eight (108) days from the Petitioner's current discharge date.

## CONCLUSION

For the foregoing reasons, the Petitioner, Jamal A. Azeez, respectfully requests that this Honorable Court enter an Order granting his Petition Under 28 USC § 2254 For Writ Of Habeas Corpus By A Person In State Custody and direct his immediate release from custody.

---

[10]  It is of no consequence that Petitioner was in Florida rather than West Virginia for the one hundred eight (108) days of credit claimed.  See, Palmer v. Dugger, 833 F.2d 253 (11 CCOA 1987)

JAMAL A. AZEEZ,
Petitioner,

By Counsel,


GREGORY R. TINGLER
West Virginia Bar No.  7804

LAW OFFICES OF DAVID A. SIMS
Attorneys at Law
P.O. Box 2659
Elkins, West Virginia 26241
304-636-8000